301 So.2d 248

**Charles THOMPSON, alias**

**v.**

**STATE.**

**8 Div. 516.**

Court of Criminal Appeals of Alabama.

Oct. 1, 1974.

Higginbotham & Evans, Florence, for appellant.

document as far as the penitentiary is concerned.

William J. Baxley, Atty. Gen., and Don C. Dickert, Sp. Asst. Atty. Gen., for the State.

TYSON, Judge.

The Grand Jury of Lawrence County, Alabama, charged the appellant with the rape of the prosecutrix, age twenty. Following a jury trial, the appellant was found guilty by the jury, and its verdict fixed punishment at ten years imprisonment. The trial court then entered judgment in accordance with this verdict.

On the night of July 18, 1973, shortly after 9:00 in the evening, the prosecutrix was at her home in the Landersville community of Lawrence County. The appellant, Charles Thompson, entered the house through a back door. The prosecutrix testified that she was alone at home on the evening in question, as the appellant had taken her mother and the younger children to Courtland to do some shopping. She stated that the appellant came after her, and she ran from him; that the appellant came into the back of the house where she grabbed a butcher knife.

From the record:

"Q. Did he come on into the house?

"A. Yes, sir.

"Q. All right. When he came in, where were you?

"A. Sitting on the couch.

"Q. What did you do?

"A. Well, when I heard the noise I jumped up to open up the front door. I tried to get the lock open, but I couldn't.

"Q. What?

"A. I tried to take the lock off the door, but I couldn't. So I turned around and—

"Q. You mean you tried to get out of the front door?

"A. Yes, sir.

"Q. All right. Go ahead.

"A. So I turned around, and when I turned around he was just coming right on to the knife. I had the knife in my hand and he just ran on against it, and I just pushed it on in him. And then he grabbed me by the throat.

"Q. Well, what did he do?

"A. Well, he was swinging me around and beating my hands on the back of the couch and the wall trying to make me drop the knife.

"Q. How did you get on the couch?

"A. He throwed me on the couch.

"Q. All right. Go ahead.

"A. Then he beat my arm and made me drop the knife, and then he throwed me from that couch to the other couch just holding me by the throat.

"Q. He threw you from one couch to the other?

"A. Yes, sir.

"Q. And then what did he do?

"A. Well, he tore my pants off.

"Q. Tore your pants off?

"A. Yes, sir.

"Q. What did he do then?

"A. Well, I was screaming and hollering and trying to get loose and he was continuing to choke me and bleeding out, and I was screaming and pushing and nearly got away, but he got the rug and put over my face and he was holding me with both of his hands.

"Q. He threw a rug over your face; is that what you are saying?

"A. Yes, sir.

"Q. Now, what else happened?

"A. Well, and then he took off my clothes and—

"Q. How did he get them off?

"A. He took them off.

"Q. What clothes did you have on?

"A. What clothes did I have on?

"Q. Yes?

"A. Well,—

"Q. Was it a dress or skirt or what?

"A. Pants, I said.

"Q. What?

"A. I said pants.

"Q. Well, I though you said that he had tore your pants off?

"A. Yes, sir.

"Q. What other clothes did he take off?

"A. My underclothes.

"Q. All right. Then what did he do?

"A. (No answer from the witness)

"Q. Did he have intercourse with you?

"A. Yes, sir.

"Q. Did you—what were you doing at the time that he had intercourse with you?

"A. I was trying to get away.

"Q. Did he put his private parts in your private parts?

"A. Yes, sir.

"Q. Then when he finished there, what happened? What did he do and what did you do?

"A. Well, I ran in the next room and hid, and I guess he left.

"Q. You ran into the next room?

"A. Yes, sir.

"Q. When did you next see him?

"A. When did I next see him?

"Q. Uh-huh.

"A. Well, after he had did all of this, he went and got my mother and other sisters and brought them home, and wanted them to take him to the doctor."

The prosecutrix testified that she telephoned Mrs. Ruth Byars that evening and told her what had happened to her that evening.

The prosecutrix also, later that evening, gave a statement to the deputy sheriff after having made a full complaint to her mother about the occurrence following her mother's return with the younger children from Courtland.

Deputy Sheriff David Carroll testified that the prosecutrix was quite upset that evening and had been crying; that he talked with her and obtained some clothing, a woman's blouse, some men's underwear, and a butcher knife, which were subsequently admitted in evidence at trial. Deputy Sheriff Carroll further testified that the appellant was taken first to the Lawrence County Hospital, where he was treated, and then taken by ambulance to

the Decatur General Hospital, where he remained for a couple of weeks. Deputy Sheriff Carroll further testified that the prosecutrix' mother pointed out the bloody men's undershorts to him, which were admitted in evidence.

Mrs. Ruth Byars testified that she did receive a call from the prosecutrix on July 18, 1973, and that the prosecutrix told her of the attack by the appellant. The prosecutrix' mother, on direct-examination, also corroborated the story of her daughter that she made the complaint to her about the assault by the appellant following her return from Courtland, but that the appellant did not mention anything to her while bringing her and the younger children back to the house; but did state that after they returned to her home, the appellant asked her to call a doctor as he needed help, that he had been cut in the side.

On cross-examination the prosecutrix' mother admitted that the appellant had been living at her home with her for some eight years, though they were not married.

The appellant's motion to exclude the State's evidence was overruled.

Appellant testified in his own behalf and stated that he did live at the home of the prosecutrix' mother in the Landersville community in Lawrence County. He testified that on the evening of July 18, 1973, he had driven the prosecutrix' mother and the younger children to Courtland to go shopping, and then returned shortly after 9:00. He testified that as he came in the house the prosecutrix began screaming and ran at him, then stabbed him with a butcher knife. He denied raping the prosecutrix.

From the record:

"Q. Did she say anything to you before she stuck you?

"A. No, she did not.

"Q. What happened after she stuck you with the knife?

"A. Well, I grabbed the knife. I seen she had done stuck me, and I grabbed the knife out of her hands. I twisted it out of her hands like this. (Indicating) And I reached and grabbed her and throwed her on the couch. It made me mad, and I started to hurt her, but I figured she was afraid and scared and I didn't hurt her.

"MR. PETTUS: We object. You started to hurt her; is that what you said?

"THE WITNESS: That is what I said.

"BY MR. HIGGINBOTHAM:

"Q. And then what happened?

"A. Well, a pain hit me where she stuck me, and I had to fold over to kill the pain.

"Q. You had to do what?

"A. I had to fold over to kill the pain.

"Q. You mean you bent over?

"A. I had to bend forward to kill the pain.

"Q. Were you bleeding?

"A. Yeah, I was.

"Q. And you say you threw her where?

"A. On the couch.

"Q. All right. And did you just throw her over there or shove her over there or what?

"A. I throwed her over there and threw my knee across her.

"Q. Which knee was it?

"A. My left knee.

"Q. And what did she have on on that occasion?

"A. Really, I didn't pay any attention.

"Q. Well, do you recognize this blouse as being the one that she had on?

"A. It might have been. Like I say, I don't know.

"Q. All right. Did you hold her down on the couch?

"A. Just for a minute or so until the pain hit me, and then I let her go.

"Q. And were you bleeding while you were holding her on the couch?

"A. I sure was. The blood was spurting out.

"Q. It was spurting out?

"A. Yes, sir, it was."

Appellant testified that, after the pain eased, he drove into Courtland and picked up the prosecutrix' mother and younger children, then returned to the home. He stated that he did not tell prosecutrix' mother anything about what had occurred during the drive back from Courtland.

On cross-examination, the appellant admitted to being over six feet tall and weighing over 235 pounds, and that prosecutrix was just over five feet tall. The appellant also admitted, on cross-examination, that he was on probation for convictions of grand larceny, and in addition for assault with intent to ravish.

I

█ We are of the opinion that the evidence in the case presented questions of fact for the jury, and that such evidence, if believed, was sufficient to sustain the conviction. Kelsoe v. State, 50 Ala.App. 378, 279 So.2d 549, cert. denied 291 Ala. 786, 279 So.2d 552; Williams v. State, 51 Ala.App. 1, 282 So.2d 349, cert. denied 291 Ala. 803, 282 So.2d 355, and authorities therein cited.

II

█ Appellant contends that during the prosecutrix' testimony on direct examination, the trial court erroneously permitted her not only to state that a complaint had been made by her, but also to give the details of such occurrence, including the identity of the accused.

However, where, as here, the appellant, from a consideration of the record as a whole, admits to being present at the home alone with the prosecutrix on the evening in question and admits throwing her on the couch following her assault upon him, the details of such prior complaint cannot be said to be prejudicially erroneous in light of the appellant's own testimony. Hall v. State, 248 Ala. 33, 26 So.2d 566; Etheridge v. State, 47 Ala.App. 233, 252 So.2d 655.

As is our statutory duty, we have carefully searched the record in this cause and find no error therein. The judgment is due to be and the same is hereby

Affirmed.

All the Judges concur.